Good morning, your honors. May it please the court. I'm Marla Zink of the Washington Appellate Project here on behalf of Akop Daniyelyan, and at counsel table is Scott Englehart, who represents Mr. Eurekian. We will attempt to divide our time six minutes each and then reserving three minutes for rebuttal. I intend to rest on the briefing for the prosecutorial misconduct error and focus today on the insufficient evidence as to both counts against Mr. Daniyelyan and then turn to the improper sentencing condition that was imposed against both defendants. With regards to the insufficient evidence, the government was required to prove both that Mr. Daniyelyan had knowledge of the object of the conspiracy alleged and that he had intent to defraud Bank of America. The evidence against Mr. Daniyelyan was not as great or at least as insufficient as it was in the case that this court decided in Krasovich. In Krasovich, this court reversed a conspiracy conviction based on insufficient evidence of knowledge of the alleged conspiracy. And in that case, this court relied on the U.S. Supreme Court case in Ingram and the Second Circuit case in Rosenblatt. Collectively, those cases stand for three principles. The first is that the government must prove knowledge of the object of the conspiracy as alleged in the indictment. The second is that to do so, the government cannot pile inference upon inference. And the third is that a suspicion or inference of some type of general illegality is not sufficient to convict on conspiracy. Here, the indictment alleged that there was a conspiracy to commit bank fraud through the depositing of insufficient fund checks and the prompt withdrawal of those funds. Now, while the government may well have proved that there was a conspiracy, the government did not prove that Mr. Daniyelyan was aware of that object. Mr. Daniyelyan, like the defendants in Ingram, where they were low-level functionaries, played at best a minor role here. Now, I don't mean to contend that the government needs to prove through direct evidence that there is an agreement to a conspiracy. But the court need look no further than Mr. Daniyelyan's co-defendant here to understand what kind of evidence the government needs to present. As far as Mr. Eurekian was concerned, as well as a co-conspirator that testified at trial, those defendants were involved in all parts of the conspiracy. They were depositing insufficient fund checks and were clearly aware of that part of the scheme. Mr. Daniyelyan, on the other hand, merely opened a bank account in Seattle and then months later purchased numerous amounts of cigarettes, neither of which… There were a lot of telephone calls between him and the defendants, members of the conspiracy, all around the time that these bogus transactions were happening, quite consistent in time and quite voluminous. The government did show that there were telephone calls between Mr. Daniyelyan's phone and Gevorg Martirosyan, who was involved in the conspiracy. But the government did not prove the content of those telephone calls, that they were in fact made by Mr. Daniyelyan, that that substantiated any knowledge on Mr. Daniyelyan's part that Gevorg or anyone else in the conspiracy was depositing insufficient fund checks into the accounts. He just accidentally loaned his phone out to somebody else on these particular days? Well, no, there's any number of things that Mr. Daniyelyan, if it was indeed him, and Mr. Martirosyan might have been discussing. Mr. Daniyelyan testified that he believed they were setting up a cigarette business and he was purchasing cigarettes for that business. It's perfectly consistent with setting up a business to talk to your partners. And he was the one purchasing the cigarettes? He was one of the people that purchased cigarettes at times. And what's his explanation for why he didn't purchase them all at once with a big fat check or a big fat withdrawal instead of at multiple transactions, even in the same store and on the same day, below a certain level? What's his explanation? Sure. I don't think that there was evidence submitted by the government at trial as to what Mr. Daniyelyan's purpose in doing that was. But there's, again, any number of purposes that might have been legal or illegal in doing so. It does no more to prove knowledge of the actual object of the conspiracy. Just like in Krasavich, that defendant purchased a car owned by the alleged co-conspirator and registered that in the co-conspirator's name. The co-conspirator clearly had the intention of defrauding the IRS, but there was no evidence that the defendant, Mr. Krasavich, knew of that purpose. The same is true here. Just let me just tick off some stuff here. I don't think Mr. Daniyelyan is the biggest idiot in the world, but he goes to the bank to borrow money for a catering business. He didn't have any background in the food service. He had no ties to the state of Washington. He did not know the address of his business. He did not have a catering business, as I said, in California, even though he told the Bank of America rep that he was moving his business. The Bank of America rep said the defendant was extremely impatient during the process. He ordered checks on an expedited basis. He gave a Hollywood address as a shipping address, only after consulting with a conspirator. He did nothing to pursue a catering business. He opened a Sam's Club membership in the name unassociated with anything, only because he sells cigarettes. He used debit cards provided to him by other conspirators. He used personal identification numbers given to him by others. The debit cards had other names on them, having little to do with cigarettes. He spread his business around. In other words, he didn't even use his own credit cards. He spread his business around in an unusual fashion, as already alluded to, using a debit card. And then he had the communications. It goes on. It goes on. What more do you need for a conspiracy for crying out loud? Well, let me just begin by saying that when Mr. Daniellen went to Bank of America in Seattle, he did not go for funds to be loaned. He went and opened a bank account. With what? With his actual personal identification, with his Social Security number, and his cousin. What did he deposit into the bank? I think it was $100 or $200 were deposited at the time that his cousin provided. I don't think Mr. Daniellen was involved in that at all. And secondly, all that evidence might add up to some general inference of illegality, but it does not lead up to the inference as to intended fraud Bank of America through depositing insufficient fund checks. Again, Mr. Daniellen was not involved in that at all. He had no knowledge of that, and the government did not prove that. And let me just say that that's for the same reasons. That's why the bank fraud conviction must also be reversed. If I can move quickly on to the sentencing condition. And how much were you trying to save? Remind me of the division. Sure. We were trying to do 6-6-3.  You know, I think the sentencing, well, let your co-counsel address that. You're over time. I want to make sure he's got enough time. Absolutely. And the sentencing and the conditions, that's small potatoes. Okay. Thank you, Your Honor. Good morning, Your Honor. Scott Englehardt, representing Gray or Etienne. I am here to argue on this one issue of the sentencing guidelines, 3B1.1. I believe that Application Note 2 and all the case law makes very clear that the government has the burden of showing that my client was a manager or supervisor of other participants. Not simply that he was involved in various aspects of what was really a very simple scheme, but rather that he actually managed or supervised particular people. Now, Application Note 4 mentions some other factors that the court can consider, such as decision-making authority. What about Susan Verdunian? Isn't there evidence that when she opened these accounts, he was there, in effect, supervising, managing the transaction? Your Honor, I know that the government puts those words to it in their brief, but what the evidence was, I believe it was Daisy Chow, I'm not sure if I have her pronunciation correct, is that she testified that my client did most of the speaking when she opened an account. Now, it should also be noted, though, Your Honor, that the main witness for the government, Artur Manasarian, I believe his name is, he testified on cross-examination, admitted that he was the one that had recruited this person. Recruited? He had recruited her. But he didn't go to the bank with her. Right. My client went to the bank with her. It sounded... How many times? I believe that the testimony was one time for opening this account and that my client did most of the speaking, suggesting that she was somehow new to this country, that he was the one who could speak for her, and that's what he did. Sorry, there was testimony, or you're saying that's the inference? That was the inference. I see. But there was absolutely no testimony that he managed her, that he supervised her in any way during this one transaction. And I don't think that that's a proper inference. It would be essentially the same as suggesting that Ms. Zink is supervising me because she came in here saying she was the one who would argue this supervised release violation issue. Not quite. That's a bad analogy. Well, I think, Your Honor, that if you're... She's glaring at you as you speak. I don't doubt that. She thought she was. I can feel that in my back. But, Your Honor, this was a simple... I realize that this was an extensive scheme, but it was really quite simple. It was simple check-kiting. It was simply taking advantage of some delays by getting accounts opened up here, making deposits somewhere else, and then buying these cigarettes somewhere else. Is there any other evidence of his supervision other than the Susan incident? I believe that he was present with at least one other person when that other person opened an account. But that's all that they indicate is that he was present. Now, we often see this kind of thing, for example, in the drug situation where somebody is going to make a delivery, someone else goes along with them, and they're present. I don't know whether it's backup or what you call it, but that does not mean that someone has supervised the other person. And the case law is quite clear about that. The cases cited in my brief and that are referenced in those cases all stand for the proposition that you have to show more than merely going along with someone else. This is a major three-point hike in the offense level, and it results, potentially, if the court follows the guidelines or uses them as a reference point, which is what often happens here, it is going to dramatically affect the sentence that's imposed. And in this case... Dramatically, roughly how many months are we talking about that might be at stake? Well, the judge imposed a sentence below the actual guidelines. Now, if the judge had three-point level adjustment for a supervisor, then the guidelines would have been, I believe, a level 25, 57 to 61 months. He got 66, assuming that the judge had otherwise imposed just a low-end sentence. That's nine months. Your Honors, I'm going to leave the rest of the time for my colleague, unless the courts have any questions. I have one question. You raised the issue about the word place in the standard language regarding sentencing. In other words, the judge should not have put in the condition, you cannot visit a place where there's drugs sold and all that kind of stuff, saying, well, that's too broad. How is anyone going to know what that means? Do you want to address that? Your Honor, if I could, I would ask that the court hear from Ms. Zink about that, as she was the one who was prepared to address that issue. Okay, thank you. Why don't we have you come back up and address it then, in response to Judge Quist's question, and then everything will be on the table for the government. Thank you. Thank you. I cut you off. I apologize. No problem. And I'm embarrassed to say, Judge Quist, could you repeat the question? No, that's fine. Yes, you argued that that special condition of supervision should not be entered, that he cannot be in a place where there are being drugs sold and all that kind of stuff, arguing that what does place mean? It could mean Los Angeles County, for example. Let me ask the question, though, because this is what I'm getting at. Why can't that be handled in the ordinary course when he gets on supervised release? Because prisoners often say, can't I change this term or condition? The probation officer usually clarifies terms and conditions and then gets a clarification if one is requested. So why does that have to come up on appeal? Why does an appellate court have to tell a district judge how to run this business? Why don't you ask the district judge to run it correctly? Sure, Your Honor, and I have a couple of responses to that. The first is that we believe that this sentencing condition is big enough that it's going to be interpreted differently by different probation officers. In addition, district courts are being asked, this is a standard condition that the U.S. Sentencing Guidelines recommends and is being standardly imposed, as much as I can tell, against defendants, and district courts are being asked to interpret this when there are alleged violations. And again, with a vague condition, those interpretations can vary. Furthermore, Mr. Daniels has a right to know before he takes a bus where drugs might be used to know whether he's allowed to take that bus for a lawful abiding purpose. And I just want to remind the court that here we also don't have any connection to a sentencing goal purpose. These defendants were in no way connected to drugs or even alcohol use. That was not part of the evidence against them. And the court specifically struck the otherwise mandatory condition that there be drug testing on supervised release. So that shows that they don't run a risk, or it's certainly not a substantial risk, of violating such a condition and shouldn't be opposed against them. Was that condition objected to at trial? It was not. So this court has plain error review, but on the constitutional issue especially, if the court agrees with us substantively. And at the moment, is there a mens rea explicitly in that condition? I have not seen a court case that would read in a mens rea, but I do believe from vega we would read a mens rea into that condition as we would with all sentencing conditions. However, I'm not sure where that gets us. Does Mr. Daniels have to know? You're worried less about mens rea than about place. Exactly. And also that that doesn't relate to a sentencing goal as to these defendants. Thank you, Your Honor. Thank you. Now you've used up all of your time, but we will give you a chance to respond. Thank you. Just so you know, when the red light precedes the time, that means you're over time by that amount of time. You're a lot nicer than the Sixth Circuit, I want to say. Good morning. May it please the Court, my name is Kate Vaughn. I'm an Assistant United States Attorney for the Western District of Washington, and I'm here on behalf of the United States. I first want to address Mr. Danielian's sufficiency argument. As the Court has recognized before in United States v. Lothian, with conspiracies and intent to defraud often not shown by direct evidence but circumstantial evidence of multiple acts, the Court listed many of Mr. Danielian's acts in furtherance of the conspiracy, and Mr. Danielian is a man that participated both at the front and back end of this conspiracy. He both opened accounts using fraudulent misrepresentations, and then he purchased cigarettes on multiple occasions, as the Court noted, using small amounts and debit cards belonging to businesses that were wholly unconnected with the cigarette business. In addition to the acts and the facts that were listed by the Court, Mr. Danielian was also found, there was also $10,000 found in a room less than nine days after he purchased over $170,000 of cigarettes when he claimed to be unemployed for the entire period of the conspiracy. The Court also raised the issue of the phone calls. Mr. Danielian, during his testimony, admitted that he had called Mr. Martirosyan, and so there was not an issue of him handing his phone to other people to make those calls. He admitted those, and that's at ER 83. What he said, and which the Court found that he had perjured himself, was that he had not spoken about the fraudulent purchases, but just purchases in general. But the evidence showed that he had spoken to Mr. Martirosyan, who is in Texas, throughout the period of the purchasing and before as well, and the inference was not that he was just confirming that cigarette purchases had been made. Mr. Danielian relies on Krasavich and Rosenblatt to say that there was insufficient evidence of knowledge of the object of the conspiracy. Neither of those cases really are on point here, because in both those cases, there were two potential conspiracies. In both those cases, there was no question that the defendants in those cases were engaged and knew they were engaged in unlawful activity. In Krasavich, it was the argument that he wasn't sure whether he was engaged in tax evasion or in money laundering. In Rosenblatt, it was the question he wasn't even sure if he was involved in tax evasion or some other means for concealing, some other reason for concealing the vehicle that he was registering on behalf of his co-defendant. Here, there is nothing before the trial court, there is nothing before this court, that Mr. Danielian thought that he may have been instead defrauding Sam's Club or committing wire fraud. The evidence and the inferences from the evidence all go towards defrauding Bank of America to bank fraud in the conspiracy. I'd like to now move on to the question raised by Mr. Urykian about the imposition of the three-point enhancement for his supervision of the account openers. The government believes that there was sufficient evidence in the record and in the pre-sentence report, which the court can rely upon, for the notion that Mr. Urykian was a supervisor here. The evidence showed that this conspiracy operated by recruiting individuals to go in and open bank accounts using their own names and their own addresses, and those individuals went in once. The accounts were then used, and then those individuals didn't open further bank accounts because the testimony was, when you go in to open a bank account, your name is run to see if there's any previous fraudulent activity. Mr. Manasarian testified that that's how the scheme worked, that he would accompany these account openers. The inference from that is these are people who have no knowledge of what they are doing, that they need supervision, that they need oversight, because although the defense counsel for Mr. Urykian said this is a simple scheme, actually what these account openers were required to do was quite complex. They were required to open three separate accounts and explain that to the bank associates who didn't typically open three bank accounts for one particular business, and they had to get it right because three bank accounts were required to make this check-kiting scheme work. The inference that can be drawn from the fact that Mr. Urykian accompanied four separate bank account openers who had not operated with this scheme before was that they needed supervision. The evidence was also clear that he did the talking when he opened the bank account in December 2009 with Susan Vardanyan, that he took all the documents at the end, and the inference is that he was supervising that process. The government therefore believes that this is sufficient to meet the preponderance of the evidence standard. Mr. Urykian's counsel also referenced the cases that relied on him in his brief. Those cases relied on him in his brief all relate to a four-level sentencing enhancement. Those cases are Lopez, Sandoval, Avila, and Tank, and they were all four-level enhancements or two-level related to leader and organizer, and this court has specifically held that proof of control or organizational authority is not required for three-level, merely supervision. I would therefore like to, if the court has no questions on that, move on to the supervised release condition. The government believes that defendants are basically presenting this in a way that place and frequent and where illegal substances are used, those words are viewed in isolation, and they're not. The sentencing, sorry, the supervised release condition, when read by a reasonable person of ordinary intelligence is not vague because frequent and place are put together. You can't frequent Los Angeles or Fresno. That doesn't make sense. The court raised an issue about conferring with a probation officer and conferring with the court, and this court has found, both in United States v. King and Romero, that when looking at vagueness, and vagueness is about notice. Do you have notice of prohibited conduct? When you look at vagueness, in the terms of a supervised release condition, the court is permitted to consider the fact that a probation officer sits down with an individual after they're released from prison and goes over those release conditions clearly with them and is available at all times for them to ask questions about where, in fact, they are permitted to go. And that provides, well, goes towards providing the notice that is required to make a supervised release condition that it addresses some of the concerns about vagueness and notice of the prohibited condition. Go ahead. Sorry. Well, I just wanted to ask, they're also attacking the furthering sentencing goals. What is the justification for anything having to do with controlled substances since that had no relationship whatsoever to this conspiracy or any of the defendants? Your Honor, this court has held in Watson that the condition of supervision doesn't need to relate to the either which here was bank fraud. Although this is a discretionary condition, it is nevertheless considered standard. And the Second Circuit found in Tresello, which is cited in the brief, that this particular condition is one of those that is appropriate to effectuate the purpose of supervised release. And the purpose of supervised release is not punitive. It's to rehabilitate individuals into the community. I understand what you say, that there's no requirement that it be related to the crime of conviction. Is there some requirement that it be related in any reasonable way to the characteristics of these people? I mean, as far as I can tell, and you can correct me if I'm wrong, these people don't have drug problems. They've got fraud problems, but drug problems is not on the list. You're correct, Your Honor. In terms of Mr. Danielian, there was nothing on the record that in any way indicated that he had drug problems. Mr. Eurekian, there was also nothing in the pre-sentence report that reflected that. Although he was not available for a pre-sentence interview because of conflicts of his counsel, I think this goes to plain error review, the fact that had this been challenged at the time the sentence was imposed, the probation officer could have addressed why that discretionary condition had been imposed. So I think Your Honor, though, is correct that typically one of the circumstances that the court does look to is the personal circumstances of these defendants. But on plain error review, what the court needs to contemplate is this particular prohibition, which is frequenting places where illegal substances are being used, is retaining that substantially prejudicial to these defendants and warranting plain error review or reversal. How could it be prejudicial if they don't do it? Exactly, Your Honor. Well, I suppose it could be prejudicial if they wind up in some place where there's an arguable violation and then they would wind up in violation of supervised release. So in that sense, they have to modify their behavior or control their behavior to avoid a violation of conditions of supervised release. So that's the prejudice, isn't it? Well, Your Honor, I have two responses to that. First of all, the court has read into these conditions men's rights, so it would have to be knowing he couldn't simply wind up and be found to have violated this condition by winding up in a place where illegal substances were being consumed or used and administered. And is it prejudicial to somebody's substantial rights to forbid them from being in a place where illegal substances are being used? That's not the kind of substantial liberty interest that was at issue in, for example, Wolfchild, which the defendant cited, which is the ability to have contact with your own family. This is a supervised release condition that relates to frequenting places where drugs are used. Maybe illegal substances includes illegally obtained funds. Illegally obtained what? Funds. Fraudulently obtained money. Maybe is that within the definition of illegal substance? Perhaps, Your Honor, I might have to brief you on that one. I'll leave you alone on the point. Thank you, Your Honor. If you have no further questions. Well, I take it tobacco is not a controlled substance. Many people think it should be, and maybe some people think it is. Illegally sell, well, controlled substance itself is a defined term, right? I believe so, yes, Your Honor. Thank you. Response? Would either of you like to respond? You don't need to. Your Honors, the government first. We're just talking about, we have to speak into the mic better. It had nothing to do with your case. Okay, now go ahead, please. I'd like to address just a few points that the government made. They claimed that the account openers needed supervision. That's simply belied by the evidence where numerous people at banks testified that these account openers did all the talking. There was only one instance. Well, but how did they know what to say? And how did they know they needed to re-account? Well, there's no evidence about how they came to know that, despite the fact that Artur Mansaryan, who appeared to be the leader's right-hand man, testified at great length, testified about my client, driving him and other people around, indicating that he's a lower-level person, not that he ever helped these people understand what they had to do, or supervised or managed how they did it, but rather he went in with a few of these people, but that was it. The government also claims that all the cases that I cited in my brief have to do with a four-level enhancement. I believe that they're correct that most of those cases are four-level enhancement cases, but there are other cases that are two-level enhancement cases. I couldn't find them right off the bat, but I know that Avia, for example, cites a couple of cases, Fuller out of the First Circuit and Marais Molina out of the Ninth Circuit. We can read the cases as well. All those cases say that for the two-level enhancement, you need to have active exercise of control or organizing. I'm sorry, I thought she talked about it. She said they weren't dealing with a three-level. Excuse me, Your Honor. The only difference between the two and the three is that there's five or more participants. We're not disputing that there were five or more participants. So you're saying that two-level reads on three-level as well? Yes, because both of those have to do with whether or not the key question is whether my client was a manager or supervisor of participants, not simply in the offense, not simply of an organization, but of participants. Okay, thank you. Thank you. Thank all three of you for your arguments. The United States v. Danieli are now submitted for decision.
judges: Quist, Fletcher, Fisher